*THE STATE v. JOHN B. STEELE.

*Inn-keepers—Municipal Ordinances—Reasonable Regulations— Assault.*

1. Where an inn-keeper made a regulation that "no livery-man, or agent of any transportation or baggage company, no washer-woman or sewing-woman not connected with the house, or loafer, or lounger, or objectionable person, will be allowed in the hotel," and gave notice to the agent of a livery-stable, who had previously been in the habit of "drumming" for custom at his hotel, not to come upon the hotel premises again: *Held*, that the inn-keeper had a right to expel said agent from the hotel without using unnecessary force, if he entered it after such notice and engaged in drumming for custom, although at the time the hotel-keeper had made an arrangement with another keeper of a livery-stable, by which the former should receive ten *per centum* of the proceeds of the business derived from the guests of the hotel, and notwith-standing the further fact that a third livery-man, representing his own stable, and who had received a similar notice, was actually in the hotel at the time of the expulsion, and had been soliciting patronage for his business among the guests, but was not shown to have had actual license from the inn-keeper to approach the guests.

---

* Head-notes by AVERY, J.

2. Guests of a hotel, and travelers, or other persons entering it with the *bona fide* intent of becoming guests, cannot be lawfully prevented from going in, or be put out, by force, after entrance, provided they are able to pay the charges and tender the money necessary for that purpose, if requested by the landlord, unless they be persons of bad or suspicious character or of vulgar habits, or so objectionable to the patrons of the house, on account of the race to which they belong, that it would injure the business to admit them to all portions of the house, or unless they attempt to take advantage of the freedom of the hotel to injure the landlord's chances of profit, derived either from his inn or any other business incidental to or connected with its management and constituting a part of the provision for the wants or pleasures of his patrons.

3. When persons, unobjectionable on account of character or race, enter a hotel, not as guests, but intent on pleasure or profit to be derived from intercourse with its inmates, they are there not of right, but under an implied license that the landlord may revoke at any time.

4. Regulations, such as those made by the Battery Park Hotel, of which the defendant was the manager, are reasonable, and any person violating them may be expelled, after notice to desist from violating them, if it be done without using excessive force. ·

5. An inn-keeper has the right to establish a livery-stable in connection with his hotel as he can a barber-shop, a news-stand, or a laundry; or he may contract with the proprietor of a livery-stable in the vicinity to secure for the latter, as far as he legitimately can, the patronage of his guests for a *per centum* of the proceeds of profits derived by the owner of such vehicles and horses from dealing with the patrons of the public house: and where he enters into such contract, he may, after notice, enforce such a regulation as that made by the Battery Park Hotel, by expelling the agents or representatives of livery-stables who enter to solicit the patronage of guests: or where such agent persists in visiting the hotel for that purpose after notice to desist, the landlord may expel him without excessive force, if he refuse to leave, and may eject him, even though he enter for a lawful purpose, if he does not disclose his true intent, when requested to leave, or whatever may have been his purpose, if he has in fact engaged in soliciting the patronage of the guests.

6. The rule is, that the proprietor of a public house has a right to request a person who visits it not as a guest or on business with guests, to depart, and if he refuse the inn-keeper may expel him, and if he do not use excessive force, may justify on a prosecution for assault and battery in removing him.

7. If the prosecutor went into the hotel at the request of a guest, and for the purpose of conferring with the latter on business, still if, while in the hotel, he engaged in "drumming" for his employer, after notice to desist from it, the defendant might expel him in the same way; and if the prosecutor, having entered to see a guest, did not then solicit business from the patrons of the hotel, but had done so previously, the defendant, seeing him there, had the right to use sufficient force to eject him, unless he explained, when requested to leave, what his real intent was. The guest, by sending for a hackman or carriage-driver, could not delegate to him the right to do an act for which even the guest himself might be lawfully put out of the hotel.

8. If it be admitted that the rule laid down in *Markham* v. *Brown* is correct, our case comes under the exception in that case, because it appears that the conduct of the prosecutor was calculated to injure the business of the hotel by diminishing its profits derived from the contract made with the keeper of the other livery-stable.

9. The defendant, as manager of the hotel, could make a valid contract for a valuable consideration with Sevier to give him the exclusive privilege of remaining in the house and soliciting patronage from the guests in any business that grew out of providing for the comfort or pleasure of the patrons of the house. The proprietor might contract for a *per centum* of the amount realized from doing a livery business with the guests, and expel, without excessive force, the agents of rival establishments who, after notice to desist, persisted in soliciting business from the guests, on the ground that they were entering his inn to injure him in his business connected with the hotel.

10. The proprietor could permit S., who contracted to pay the hotel ten *per centum* of the proceeds of his business with the guests, to remain, or omit to order C., a liveryman who had received a notice similar to that sent to the prosecutor, to leave, and expel the prosecutor without violating the constitutional inhibition against monopolies.

This was a CRIMINAL ACTION, tried before *Moore, J.,* at the October Term, 1889, of the Criminal Court of BUNCOMBE County, on an appeal from a Court of a Justice of the Peace of said county.

Joseph Weaver, the prosecutor, swore that a Mr. Dawson, who was a guest at the Battery Park Hotel, in the city of

Asheville, called to him to supply him some horses from a livery-stable in the city of Asheville, with which stable the witness was connected as the agent of the manager and owners thereof; that because of this, he went up on the porch of the hotel, when the defendant, who was the manager of the hotel, came up to him and asked him to get off; the witness replied, "All right, sir," and then started off, but before he could get off, the defendant pushed him, and he would have fallen and been hurt had he not caught on the railing  Witness stated, on his cross-examination, that he did not know whether the defendant knew he was drumming for a livery-stable or not; that the defendant had notified him in writing, previous to that time, not to go on the grounds of the hotel; that defendant told him before that day to go on the back side of the hotel when he had livery business to transact with the guests of the hotel, to a place designated for livery-men to conduct such business; that he had been notified by the defendant to keep off the porch before that day; that on that day he was standing on the steps of the hotel porch; that the defendant did not give him time to get off; that the defendant was within two feet of him when he said, "Get off of here," and that before he could get off the defendant pushed him off, as he above described; that defendant pushed him after he was down off the steps, where he was permitted to stay.

The defendant introduced in evidence the rules and regulations of the hotel, which were printed on a heavy piece of card-board.

The defendant being introduced to testify in his own behalf, said he was the manager of the Battery Park Hotel and its business; that the prosecutor, on the day of the alleged assault, was on the porch of the hotel interfering with parties working on the hotel; that he told the prosecutor to go away and go off the porch, and that he might stay at the place designated for livery-men; the prosecutor was a livery-

man; that he kept two persons to receive orders for all livery-men from said place so designated from guests at the hotel, and that it was the duty of these two persons to transact all business between the guests of the hotel and livery-men, and that he made no charge against livery-men or anyone else on account of the services of such persons; that the prosecutor knew of this rule and regulation of the hotel, and was on the porch in violation of the rule; that he told him to go away and he did not go; that he then put his hands gently on the prosecutor and pushed him gently down the steps off the porch; that he only used such force as was necessary to put the prosecutor off the porch; that he used no violence whatever.

Witness further testified that the prosecutor constantly came into the hotel and would "hang around;" that he would go on the porch and hang around there, spitting tobacco juice around on the floor and on the railing of the porch; that on the morning of the difficulty, the prosecutor had a stick under his arm; that it was the duty of the witness, under the rules of the hotel, to keep all livery-men out of the hotel.

On cross-examination, the witness testified that he had told Weaver and other livery-men not to come there; that he saw the prosecutor spitting on the floor; that he had some time before that made a contract with one Sevier, a livery-man, to do the livery business for the hotel, and that Sevier was to pay him ten per cent. of the proceeds of the business; that he had thrown up the contract with Sevier by order of Col. Coxe, the owner of the hotel; that he heard the prosecutor drumming that morning; that he was talking about horses and carriages, and was talking loud; that Mr. Sevier and all other persons in the livery business could get orders to and from the guests of the hotel; that he had never seen the prosecutor drunk; that he does not know for certain that Sevier is now, and was then, paying ten per

cent. of the proceeds of the livery business of the hotel to Col. Coxe.

The defendant then proposed to offer in evidence two ordinances of the City of Asheville, as follows:

"SEC. 681. Any porter who shall enter the general passenger depot, or any passenger depot in this city for any hotel or boarding-house, or eating-house without the consent of the railroad authorities in charge of such depot, shall upon conviction, be fined five dollars.

"SEC. 682. If any person or persons shall enter any passenger depot, hotel, boarding-house, or other place of business, and violate the rules thereof, or hinder or obstruct the business therein, may be ordered out by the person in charge, and, upon refusal to go, shall be punished as provided in the preceding section, provided said rules shall be reasonable, and shall have been approved by the Mayor and Board of Aldermen."

The defendant then offered in evidence other ordinances of the city of Asheville, for the purpose of showing that the rules of the hotel had, by an ordinance of the said city, been duly approved. The Solicitor for the State objected to the introduction of these ordinances. The objection was sustained by the Court, and the defendant excepted.

Henry Nettles was then introduced by the defendant, and swore that he was employed at the Battery Park Hotel; that it was his duty to announce carriages when ready, to take orders from guests of the hotel, and to send orders to any livery-stable in town desired by the guests, and to take orders to and from livery-men at places designated for them by the hotel authorities; that a Mr. Reynolds was also employed for the same purpose; that he had seen the prosecutor there; had seen him often spitting tobacco juice on the floor and drumming among the guests; that he had seen him when pretty full of liquor at the hotel, but not down drunk; that he saw the difficulty between the defend-

ant and the prosecutor; that he had collected bills for the prosecutor from guests of the hotel; that when he was asked by a guest to order a carriage, that he would ask what stable he wanted it from, and if no particular stable was mentioned, he would give it to the one he (witness) wanted to have it.

In reply, the State introduced one H. S. Loomis, who swore that he was the room and bill clerk at the Battery Park Hotel; that the written contract between Sevier and the defendant, as to the livery business of the hotel, had been destroyed, but the agreement was still in force, the only difference in the terms being that, under contract originally, he collected the money, while now Sevier collected it; that he knows the hotel gets ten per cent. of the proceeds of the business done by Sevier, and not of the business done by other livery-men.

E. C. Chambers swore that he was a livery-man, doing business in the city of Asheville; that he had received the same notice received by the prosecutor; that he drummed at the hotel among the guests for custom since he had received the notice, and that he had not been put out of the hotel, or ordered to leave; that he had also had a man employed to drum for him since the notice had been given him.

The Court gave the following instructions (only those parts of the charge material to the exceptions are set out):

"It being admitted by both the State and the defendant that the premises from which the defendant put the prosecutor, in this case, were those of a public inn or hotel, and that the defendant was at the time the manager thereof and in control of the same. The Court charges you that it was the duty of defendant, and the law devolved it upon him, to prescribe such reasonable rules and regulations as were necessary to the comfort of his guests, to secure quiet and good order, and to procure the exclusion from the hotel of

disorderly persons, and such, as by their conduct, manner and habits or business are nuisances and an annoyance and discomfort to the guests of the hotel. It was also the duty of the defendant to his guests, and he had the right, to prevent all such persons coming into the hotel, and after they should come into the hotel, or upon the porch thereof, to order them to go away, and, upon a refusal to go, to put his hands gently upon them and gently remove them, and, in the event of resistance, to use such force as would be necessary to remove them.

\*       \*       \*       \*       \*       \*       \*       \*

" The questions, then, for consideration and determination, are: 1. Did the prosecutor have the right to go to the Battery Park Hotel to transact the business of his employer— that of a livery-man—with the guests of the hotel? 2. If he did have such right, did he so conduct and demean himself while there as to forfeit his right to be there? 3. If he had no right to go to the hotel to transact his business as a livery-man, or if, while there, having such right to go and to be there, he so conducted himself as to forfeit such right, did the defendant use only such force as the law permitted him to use in removing the prosecutor, or was the force excessive and unlawful?

" The Court charges you that, if you shall find from the evidence that others engaged in the same business as the prosecutor were permitted by the defendant to go to the Battery Park Hotel for the same purpose for which the prosecutor went there—that is, to secure and transact business for his employer's livery-stable,—then the prosecutor had also the right to go there for that purpose, at reasonable times, and to remain there a reasonable length of time for the transaction of such business; and it would not matter that the rules of the hotel forbade his entering the premises of the hotel for that purpose, or that he had been previously forbidden, in writing, to come upon the premises of the hotel, nor would it matter that the defendant had designated

a place at the back of the hotel where livery-men could transact their livery business with the guests of the hotel through the servants and employees of the hotel, even though the prosecutor knew of such place being so designated. He would not, however, have the right to go there at all times, nor would he have the right to remain there all the time, or an unreasonable length of time, for the transaction of such business, against the will of the owner or manager.

" If the jury shall find from the evidence, under the charge of the Court, that the defendant permitted others engaged in the same business as the defendant, to-wit, the livery business, to go to the hotel to transact such business, and that other persons did go there, and there transact such business, although the prosecutor would then have the same rights at the hotel as such other person, yet, if while at the hotel the prosecutor so demeaned himself, by becoming intoxicated, by spitting tobacco juice on the floor, loud and boisterous talking, cursing, swearing, and other conduct, as to become a nuisance, an annoyance and discomfort to the guests and officers of the hotel; or if he went there at an unreasonable time for the transaction of such business, or remained there an unreasonable length of time for the transaction of such business, against the will of the defendant, he lost all right to be at the hotel for any purpose, and it became the duty and right of the defendant to order him away, and upon his refusal to go, to first put his hands gently upon him and gently put him away, and in the event of resistance, to use such force as would be necessary to eject him.

" The defendant would, in no event, have the right to use excessive force in putting the prosecutor off the porch and steps of the hotel."

The defendant excepted to the charge of the Court as follows:

1. The Court erred in submitting the question to the jury, as to whether or not the rules and regulations adopted by the Battery Park Hotel were reasonable and proper.

2. That the Court erred in submitting the question to the jury, as to whether or not other persons engaged in the same business as the prosecutor were permitted by the defendant to go to the hotel for the purpose of carrying on this business, for that there was no evidence that the defendant permitted or allowed such to be done.

3. That the Court erred in the following instructions given to the jury: "If you shall find from the evidence that others engaged in the same business as the prosecutor were permitted by the defendant to go to the Battery Park Hotel for the same purpose for which the prosecutor went there—that is, to secure and transact business for his employer's livery-stable—then the prosecutor had also the right to go there for that purpose at reasonable times, and to remain there a reasonable length of time for the transaction of such business; and it would not matter that the rules of the hotel forbade his entering the premises of the hotel for that purpose, or that he had been previously forbidden, in writing, to come upon the premises of the hotel."

4. That the Court erred in the following instructions given to the jury: "Nor would it matter that the defendant had designated a place at the back of the hotel where livery-men could transact their livery business with the guests of the hotel through the servants and employees of the hotel, even though the prosecutor knew of such place being so designated."

At the meeting of the Board of Aldermen of the city of Asheville, on the 16th day of August, 1889, the following was adopted:

"It was moved and seconded, that the following rules for the regulation and government of the Battery Park Hotel be approved by the Board:

"No livery-man or agent of any transportation or baggage company, no washer-woman or sewing-woman not connected with the house, or loafer or lounger, or objectionable person, will be allowed in the hotel."

There was a verdict against the defendant, and he, having excepted, appealed.

*The Attorney General* and *Mr. G. A. Shuford*, for the State.
*Messrs. D. Schenck, H. A. Gudger, J. B. Batchelor* and *John Devereux, Jr.*, for defendant.

AVERY, J.—after stating the facts: It was formerly held by the Courts of England that where an inn-keeper allured travelers to his tavern by holding himself out to the public as ready to entertain them, and then refused to receive them into his house when he had room to accommodate them, and after they had tendered the money to pay their bills, he was liable to indictment. But this doctrine (says Bishop, Vol. I, § 532, Cr. Law) has little practical effect at this time, being rather a relic of the past than a living thing of the present. *Rex* v. *Lewellyn*, 12 Mod. Rep., 445. In a *dictum* in *State* v. *Mathews*, 2 Dev. & Bat., 424, this old principle was stated with some qualification, viz., "that all and every one of the citizens have a right to demand entertainment of a public inn-keeper, if they behave themselves and are willing and able to pay for their fare; and as all have a right to go there and be entertained, they are not to be annoyed there by disorder, and if the inn-keeper permits it he is subject to be indicted for a nuisance." *Rommel* v. *Schonbacker*, 127 Penn. St. Rep., 579. The duty and legal obligation resting upon the landlord is to admit only such guests as demand accommodation, and he has the right to refuse to allow even travelers who are manifestly so filthy, drunken or profane as to prove disagreeable to others who are inmates, and thereby to injure the reputation of his house, to enter his inn for food or shelter, though they may be abundantly able to pay his charges. 2 Wharton Cr. Law, § 1587; *Recks* v. *Rymer*, 13 Cox Cr. Law, 378. The right to demand admission to the hotel is confined to persons who sustain the relation of guests, and does not extend to every individual who invades the premises, not in response to the invitation given by the

keeper to the public, but in order to gratify his curiosity by seeing, or his cupidity by trading with, patrons who are under the protection of the proprietor. Wharton C. L., § 625. The landlord is not only under no obligation to admit, but he has the power to prohibit the entrance of any person or class of persons into his house for the purpose of plying his guests with solicitations for patronage in their business, and especially is this true when the very nature of the business is such that human experience would lead us to expect the competing drummers, in the heat of excitement, not only to trouble the guests by earnest and continued approaches, but by their noise, or even strife. The guest has a positive right to demand of the host such protection as will exempt him from annoyance by persons who intrude upon him, without invitation and without welcome, and subject him to torture by a display of their wares or books, or a recommendation of their nostrums or business. That learned and accomplished jurist, Chief Justice SHAW, delivering the opinion in *Commonwealth* v *Power*, 7 Metc., 600, said: "An owner of a steamboat or railroad, in this respect, is in a condition somewhat similar to that of an inn-keeper, whose premises are open to all guests; yet, he is not only empowered, but he is bound so to regulate his house as well with regard to the peace and comfort of his guests who there seek repose as to the peace and quiet of the vicinity, and to repress and prohibit all disorderly conduct therein; and, of course, he has a right and is bound to exclude from his premises all disorderly persons and all persons not conforming to regulations necessary and proper to secure such quiet and good order." This principle was stated as an established one, and used by the Court as an argument to sustain, by analogy, its ruling, announced in a subsequent portion of the opinion, that a railroad company had a right, by its regulations, to exclude from its depot and cars, at any station, persons who visited them for the purpose of soliciting passengers to stop at particular hotels; and one of the reasons

given for holding the regulation reasonable was, that where the agents urged the claims of their respective hotels "with earnestness and importunity, it was an annoyance to passengers." The doctrine is there laid down, too, that persons other than passengers *prima facie* have the right to enter the depot of a railroad company as others besides guests may go into hotels without making themselves trespassers, because, in both instances, there is an implied license given to the public to enter; but such licenses, in their nature, are revocable, except in the one case as to passengers, and in the other as to guests, who have the right to enter the train, ticket-office or hotel, as the case may be, if they are sober, orderly and able to pay for transportation or fare. The Court went further in that case and held that in enforcing the reasonable regulation against drummers for hotels at the depot, the servants of the railway company were not guilty of an assault for expelling by force, not excessive, a person who had repeatedly violated the regulation by going upon the platform and soliciting for a hotel, though, on the particular occasion when he was ejected from it, he had a ticket and intended to take the train destined for another town, but failed to disclose to such servants the fact that he entered for "another purpose, when it was in his power to do so." Were we to follow the analogy to which the principle laid down in that case would lead, an inn-keeper could not only make and enforce a regulation forbidding persons to come on his premises for the purpose of soliciting his guests to patronize the livery-stables that they might represent, but he might, in enforcing the rule against one, who had previously violated it after notice that he should not do so, put such person off his premises, without excessive force, though, at the particular time the person had entered with the *bona fide* intent to become a guest at the hotel, but failed to announce his purpose, or, under the same principle, he might expel by force one who

becomes a guest and takes advantage of his situation to sub-
ject other inmates of the house to the annoyance of drum-
ming for such establishments. The same distinction is
drawn between guests and others who enter a hotel intent
on business or pleasure by the Courts of Pennsylvania. In
*Com.* v. *Mitchell*, 1 Phil. (Pa.). 63, and *Com.* v. *Mitchell*, 2
Pars. (Pa.) Sel. Cases, 431, it was held that an inn-keeper is
bound to receive and furnish food and lodging for all who
enter his hotel as guests and tender him a reasonable price
for such accommodations; but "if an individual (other
than a guest) enters a public inn, and his presence is dis-
agreeable to the proprietor and his guests, he has a right to
request the person to depart, and, in case of refusal, to lay
his hands gently upon him and lead him out, and if resist-
ance is made, to employ sufficient force to put him out,
without incurring liability to indictment for assault and
battery."

Justice STORY, in *Jencks* v. *Coleman*, 2 Sumner's Rep., 224,
discussed the doctrine to which we have referred, that the
right even of one who pays for his passage on a steam-
boat or railway, is subject not only to the limitation that he
shall be sober, and shall not be guilty of such nuisance, or
make such disturbance as shall annoy other passengers, or
whose characters are doubtful, dissolute, suspicious or
unequivocally bad, but to the further restriction that he
may be refused admittance or expelled, after he enters the
boat or car, if it appear that his object is to interfere with
the interests or patronage of the proprietors, or company,
so as to make the business less lucrative to them."

In the case last cited, the proprietors of the boat "Franklin"
had entered into a contract to run a line of stages between
Boston and Providence in connection with the boat, which
was running from New York to Providence  The plaintiff
Jencks had been in the habit of coming on board the boat
at Newport to solicit passengers for an opposition line of

stages between Providence and Boston, thus interfering with the business of the owners of the boat, and the arrangement made by them for their own profit and advantage with a different line from that represented by said plaintiff, just as in the case at bar the proprietors of the hotel had entered into a contract with one Sevier by which they were to receive ten *per centum* of the amount realized by him for the hire of carriages to the guests of the Battery Park Hotel. Justice STORY, too, runs the parallel between the hotel and boat line just as Chief Justice SHAW did between the inn and the railway company, but with the marked difference that the former goes much further in tracing the analogy that makes the public house subject to some of the same liabilities created, and entitled to the full measure of protection afforded by law to companies engaged in transporting passengers. In discussing the principle, he says: " A case still more strongly in point, and which, in my judgment, completely meets the present, is that of an inn-keeper. Suppose passengers are accustomed to breakfast or dine or sup at his house, and an agent is employed by a rival house, at the distance of a few miles, to decoy the passengers away the moment they arrive at the inn. Is the inn-keeper bound to entertain and lodge such agent, and thereby enable him to accomplish the very objects of his mission to the injury or ruin of his own interests? I think not."

In the case of *Barney* v. *Steamboat Co.*, 67 N. Y., 302, the Court of Appeals held that a company running a line of steamboats for transporting passengers had a right to establish in connection with their boats an agency for the delivering of baggage at the terminus, and that one who had had the contract to transfer such baggage upon similar terms two years before could be expelled and refused as a passenger, if, after notice, he would not discontinue his efforts to induce passengers to employ him in the same capacity rather than an expressman with whom the company had entered

into a later agreement, for their own pecuniary interest, to deliver the baggage of its passengers. All of the authorities that we have cited above are collated and approved in Angell on Carriers, §§ 530, and 530*a* and 530*b*.

In the case of *Harris* v. *Stevens*, 31 Vermont, 79, it was held that when a railway company erected station-houses, it impliedly opened the doors of them to every person to enter, but that the license was revocable as to all persons except those who had legitimate business there, growing out of the operation of the road and with the officers or employees of the company, and that the corporation had the right to direct all other persons to leave the depot or ticket office, and, on their refusal to depart, to remove them. It was further held in the same case, that it was a reasonable regulation to require every one who expected to take the train and desired to remain in the station-house for that purpose, to purchase a ticket, and that the servants of the company would be justified in expelling, without excessive force, one who did not declare his purpose to buy a ticket, and actually buy it within a reasonable time, or one who had bought a ticket even, if he failed to disclose that fact when requested to leave.

In the recent case of *Old Colony Co* v. *Tripp*, 147 Mass., 35, the Court laid down the rule in reference to the rights of persons at depots, as follows: "Passengers taking and leaving the cars at the station, and persons setting down passengers or delivering merchandise or baggage for transportation from stations, or taking up passengers, or receiving merchandise that had been transported to the station, had a right to the building and grounds superior to the right of the plaintiff (corporation) to exclusive occupancy." And it is further held to be the correct construction to be placed on a statute passed by the Legislature, giving to all persons "equal terms, facilities and accommodations for the use of its depot and other buildings and grounds," that it was

intended only to govern the relation between the common carrier and its patrons; and hence, that a railroad company, even in the face of such a statute, had a right to contract with an individual to furnish the means to carry incoming passengers, or their baggage and merchandise, from its stations, and might grant to him the exclusive right to solicit the patronage of such passengers.

Upon a review of all the authorities accessible to us, and upon the application of well-established principles of law to the admitted facts of this particular case, we are constrained to conclude that there was error in the charge given by the Court to the jury, because—

1. Guests of a hotel, and travelers or other persons entering it with the *bona fide* intent of becoming guests, cannot be lawfully prevented from going in, or be put out, by force, after entrance, provided they are able to pay the charges and tender the money necessary for that purpose, if requested by the landlord, unless they be persons of bad or suspicious character, or of valgar habits, or so objectionable to the patrons of the house, on account of the race to which they belong, that it would injure the business to admit them to all portions of the house, or unless they attempt to take advantage of the freedom of the hotel to injure the landlord's chances of profit derived either from his inn or any other business incidental to or connected with its management and constituting a part of the provision for the wants or pleasure of his patrons. *Jincks* v. *Coleman, supra; Com.* v. *Mitchell, supra; Com.* v. *Power, supra; Pinkerton* v. *Woodard,* 91 Am. Dec., 660; *Barney* v. *Steamboat Co., supra;* 1 Wharton's Cr. L., § 621; Angell on Carriers, §§ 525, 529 and 531; *Britton* v. *Railroad Co.,* 88 N. C., 536.

2. When persons, unobjectionable on account of character or race, enter a hotel not as guests, but intent on pleasure or profit, to be derived from intercourse with its inmates, they are there not of right, but under an implied license that the

landlord may revoke at any time, because, barring the limitation imposed by holding out inducements to the public to seek accommodation at his inn, the proprietor occupies it as his dwelling-house, from which he may expel all who have not acquired rights growing out of the relation of guest, and *must* drive out all who, by their bad conduct, create a nuisance and prove an annoyance to his patrons. *Harris* v. *Stevens*, 31 Vt., 79; 1 Wharton's Cr. L., § 623.

3. The regulation, if made by an inn-keeper, that the proprietors of livery-stables and their agents, or servants, shall not be allowed to enter his hotel for the purpose of soliciting patronage for their business from his agents, is a reasonable one, and after notice to desist, a person violating it, may be lawfully expelled from his house if excessive force be not used in ejecting him. *Com.* v. *Power, supra; Harris* v. *Stevens, supra.* See also *Grizwald* v. *Webb*, recently reported in 41 Alb. Law Jour., 351 (a Rhode Island case); *Old Colony Co.* v. *Tripp, supra.*

4. An inn-keeper has, unquestionably, the right to establish a news-stand or a barber-shop in his hotel, and to exclude persons who come for the purpose of vending newspapers or books, or of soliciting employment as barbers, and, in order to render his business more lucrative, he may establish a laundry or a livery-stable in connection with his hotel, or contract with the proprietor of a livery-stable in the vicinity to secure for the latter, as far as he legitimately can, the patronage of his guests in that line for a *per centum* of the proceeds or profits derived by such owner of vehicles and horses from dealing with the patrons of the public house. After concluding such contract, the inn-keeper may make, and, after personal notice to violators, enforce a rule excluding from his hotel the agents and representatives of other livery-stables who enter to solicit the patronage of his guests, and where one has persisted in visiting the hotel for that purpose, after notice to desist, the proprietor may use

sufficient force to expel him if he refuses to leave when requested, and may eject him, even though, on a particular occasion, he may have entered for a lawful purpose, if he does not disclose his true intent when requested to leave, or whatever may have been his purpose in entering, if he, in fact, has engaged in soliciting the patronage of the guests. *Barnes* v. *Steamboat Co., supra; Jenks* v. *Coleman,* and *Harris* v. *Sneeden, supra;* Angell on Corporations.

5. The broad rule laid down by Wharton (1 Cr. L., § 625), is that the proprietor of a public house has a right to request a person who visits it, not as a guest or on business with guests, to depart, and if he refuse, the inn-keeper has a right to lay his hands gently on him and lead him out, and if resistance be made, to employ sufficient force to put him out. For so doing, he can justify his conduct on a prosecution for assault and battery." It will be observed that the author adopts, in part, the language already quoted from the Courts of Pennsylvania.

6. If it be conceded that the prosecutor went into the hotel, at the request of a guest, for the purpose of conferring with the latter on business, still, in any view of the case, if, after entering, he engaged in "drumming" for his employer when he had been previously notified to desist, in obedience to a regulation of the house, the defendant had a right to expel him, if he did not use more force than was necessary; and if the prosecutor, having entered to see a guest, did not then solicit business from the patron of the hotel, but had done so previously, the defendant, seeing him there, had a right to use sufficient force to eject him, unless he explained when requested to leave what his real intent was. *Harris* v. *Stevens,* and *Com.* v. *Power, supra.* The guest, by sending for a hackman, could not delegate to him the right to do an act for which even the guest himself might lawfully be put out of the hotel.

7. If we go further and admit, for the sake of argument, that the principle declared in *Markham* v. *Brown*, 8 N. H., 209, and relied on to sustain the view of the Court below, is not inconsistent with the law on the same subject, as we find it laid down by Wharton and other recognized authorities, still our case will be found to fall under the exception to the general rule stated in express terms in that case. The Court said: "Where one comes to injure the inn-keeper's house, or if his business operates directly as an injury, that may alter the case, but that has not been alleged here. Perhaps there may be cases in which he may have a right to exclude all but travelers and those who have been sent for by them. It is not necessary to settle that at this time." There was no evidence in *Markham* v. *Brown* that the proprietor of the hotel had any contract with another stage line, or would suffer pecuniary loss or injury if the agent who was expelled were successful in his solicitations, and it seems that Angell and others, who cite as authority that case, as well as *Jenks* v. *Coleman* and *Barney* v. *Steamboat Co.*, reconcile them by drawing the distinction that in the latter cases, and in the hypothetical case of an inn-keeper, put by Justice STORY, the person whose expulsion was justified was doing an injury to the proprietor who had him removed, by diminishing his profits derived legitimately from a business used as an adjunct to that of common carrier or inn-keeper. In using the language quoted above, Justice PARKER seems to have had in his mind, without referring to it, the opinion of Justice STORY delivered in the Circuit Court but two years before.

8. The defendant, as manager of the hotel, could make a valid contract for a valuable consideration with Sevier to give him the exclusive privilege of remaining in the house and solicting patronage from the guests in any business that grew out of providing for the comfort or pleasure of the

patrons of the house. The proprietors of the public house might legitimately share in the profits of any such incidental business, as furnishing carriages, buggies or horses to the patrons, and for that purpose had as full right to close their house against one who attempted to injure the business in which they had such interest, as the owner of a private house would have had, and this view of the case is consistent with the doctrine enunciated in *Markham* v. *Brown.* There was no evidence tending to show that Chambers had actual permission from the proprietors to approach the inmates of the hotel on the subject of patronizing him, nor that they had actual knowledge of the fact that he had continued his solicitations after receiving a similar notice to that sent to the prosecutor. The fact that he was overlooked or passively allowed to remain in the hotel (it may be under the impression on the part of the defendant that he had desisted from his objectionable practices) cannot, in any view of the law, work a forfeiture of the right to enforce a reasonable regulation made to protect their legitimate business from injury. If, therefore, a permit on the part of the defendant to Chambers to " drum " gratuitously in the house, would at once have opened his doors to all of the competitors of the latter (a proposition that we are not prepared to admit), the defendant did not, so far as the testimony discloses the facts, speak to him on the subject, and the soundness of the doctrine that, without interfering with· the legal rights of the guests, the proprietor of a· hotel is prohibited by the organic law from granting such exclusive privileges to any individual as to the use or occupancy of his premises, as any other owner of land may extend, is not drawn in question.

We, therefore, sustain the second and third assignments of error. His Honor erred for the reasons given in instructing the jury that the guilt of the defendant depended upon the question whether he permitted Chambers or Sevier to solicit custom in the house. He had a lawful right to dis-

criminate for a consideration in favor of Sevier, while it does not appear from the evidence that he granted any exclusive privileges to Chambers.

We hold that the regulation was such a one as an innkeeper had the power to make, and must not be understood as approving the idea that the sanction of the municipal authorities could impart validity to it, if it were not reasonable in itself, and within the powers which the law gives to proprietors of public houses in order that they may guard their own rights and protect their patrons from annoyance.

For the reasons given, the defendant is entitled to a new trial.

