LOMBARD ET AL. *v.* LOUISIANA.

No. 58. Argued November 5–7, 1962.—
Decided May 20, 1963.

*John P. Nelson* argued the cause for petitioners. With him on the brief were *Carl Rachlin, Judith P. Vladeck, Robert F. Collins, Nils R. Douglas* and *Janet M. Riley.*

*Jack P. F. Gremillion,* Attorney General of Louisiana, argued the cause for respondent. With him on the brief were *Michael E. Culligan* and *William P. Schuler,* Assistant Attorneys General.

*Solicitor General Cox,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Assistant Attorney General Marshall, Ralph S. Spritzer, Louis F. Claiborne, Harold H. Greene, Howard A. Glickstein* and *Richard K. Berg.*

Mr. Chief Justice Warren delivered the opinion of the Court.

This case presents for review trespass convictions resulting from an attempt by Negroes to be served in a privately owned restaurant customarily patronized only by whites. However, unlike a number of the cases this day decided, no state statute or city ordinance here forbids desegregation of the races in all restaurant facilities. Nevertheless, we conclude that this case is governed by the principles announced in *Peterson* v. *City of Greenville, ante,* p. 244, and that the convictions for this reason must be reversed.

Petitioners are three Negro and one white college students. On September 17, 1960, at about 10:30 in the morning they entered the McCrory Five and Ten Cent Store in New Orleans, Louisiana. They sat down at a refreshment counter at the back of the store and requested service, which was refused. Although no sign so indicated, the management operated the counter on a segregated basis, serving only white patrons. The counter was designed to accommodate 24 persons. Negroes were welcome to shop in other areas of the store. The restaurant manager, believing that the "unusual circumstance" of Negroes sitting at the counter created an "emergency," asked petitioners to leave and, when they did not do so, ordered that the counter be closed. The restaurant manager then contacted the store manager and called the police. He frankly testified that the petitioners did not cause any disturbance, that they were orderly, and that he asked them to leave because they were Negroes. Presumably he asked the white petitioner to leave because he was in the company of Negroes.

A number of police officers, including a captain and major of police, arrived at the store shortly after they were called. Three of the officers had a conference with the store manager. The store manager then went behind

the counter, faced petitioners, and in a loud voice asked them to leave. He also testified that the petitioners were merely sitting quietly at the counter throughout these happenings. When petitioners remained seated, the police major spoke to petitioner Goldfinch, and asked him what they were doing there. Mr. Goldfinch replied that petitioners "were going to sit there until they were going to be served." When petitioners still declined to leave, they were arrested by the police, led out of the store, and taken away in a patrol wagon. They were later tried and convicted for violation of the Louisiana criminal mischief statute.[1] This statute, in its application to this case, has all the elements of the usual trespass statute. Each petitioner was sentenced to serve 60 days in the Parish Prison and to pay a fine of $350. In default of payment of the fine, each was to serve 60 additional days in prison. On appeal to the Supreme Court of Louisiana the judgments of conviction were affirmed. 241 La. 958, 132 So. 2d 860. Because of the substantial federal questions presented, we granted certiorari. 370 U. S. 935.

Prior to this occurrence New Orleans city officials, characterizing conduct such as petitioners were arrested for as "sit-in demonstrations," had determined that such attempts to secure desegregated service, though orderly and possibly inoffensive to local merchants, would not be permitted.

---

[1] La. Rev. Stat., 1950 (Cum. Supp. 1960), § 14:59 (6), provides in pertinent part:

"Criminal mischief is the intentional performance of any of the following acts:

"(6) Taking temporary possession of any part or parts of a place of business, or remaining in a place of business after the person in charge of such business or portion of such business has ordered such person to leave the premises and to desist from the temporary possession of any part or parts of such business."

Exactly one week earlier, on September 10, 1960, a like occurrence had taken place in a Woolworth store in the same city. In immediate reaction thereto the Superintendent of Police issued a highly publicized statement which discussed the incident and stated that "We wish to urge the parents of both white and Negro students who participated in today's sit-in demonstration to urge upon these young people that such actions are not in the community interest. . . . [W]e want everyone to fully understand that the police department and its personnel is ready and able to enforce the laws of the city of New Orleans and the state of Louisiana." [2]   On September 13,

---

[2] The full text of the statement reads:

"The regrettable sit-in activity today at the lunch counter of a Canal st. chain store by several young white and Negro persons causes me to issue this statement to the citizens of New Orleans.

"We urge every adult and juvenile to read this statement carefully, completely and calmly.

"First, it is important that all citizens of our community understand that this sit-in demonstration was initiated by a very small group.

"We firmly believe that they do not reflect the sentiments of the great majority of responsible citizens, both white and Negro, who make up our population.

"We believe it is most important that the mature responsible citizens of both races in this city understand that and that they continue the exercise of sound, individual judgment, goodwill and a sense of personal and community responsibility.

"Members of both the white and Negro groups in New Orleans for the most part are aware of the individual's obligation for good conduct—an obligation both to himself and to his community. With the exercise of continued, responsible law-abiding conduct by all persons, we see no reason for any change whatever in the normal, good race-relations that have traditionally existed in New Orleans.

"At the same time we wish to say to every adult and juvenile in this city that the police department intends to maintain peace and order.

four days before petitioners' arrest, the Mayor of New Orleans issued an unequivocal statement condemning such conduct and demanding its cessation. This statement was also widely publicized; it read in part:

> "I have today directed the superintendent of police that no additional sit-in demonstrations . . . will be permitted . . . regardless of the avowed purpose or intent of the participants . . . .

> "It is my determination that the community interest, the public safety, and the economic welfare of this city require that such demonstrations cease and that henceforth they be prohibited by the police department." [3]

---

"No one should have any concern or question over either the intent or the ability of this department to keep and preserve peace and order.

"As part of its regular operating program, the New Orleans police department is prepared to take prompt and effective action against any person or group who disturbs the peace or creates disorder on public or private property.

"We wish to urge the parents of both white and Negro students who participated in today's sit-in demonstration to urge upon these young people that such actions are not in the community interest.

"Finally, we want everyone to fully understand that the police department and its personnel is ready and able to enforce the laws of the city of New Orleans and the state of Louisiana."

[3] The full text of the Mayor's statements reads:

"I have today directed the superintendent of police that no additional sit-in demonstrations or so-called peaceful picketing outside retail stores by sit-in demonstrators or their sympathizers will be permitted.

"The police department, in my judgment, has handled the initial sit-in demonstration Friday and the follow-up picketing activity Saturday in an efficient and creditable manner. This is in keeping with the oft-announced policy of the New Orleans city government that peace and order in our city will be preserved.

Both statements were publicized in the New Orleans Times-Picayune. The Mayor and the Superintendent of Police both testified that, to their knowledge, no eating establishment in New Orleans operated desegregated eating facilities.

Both the restaurant manager and the store manager asked the petitioners to leave. Petitioners were charged with failing to leave at the request of the store manager. There was evidence to indicate that the restaurant manager asked petitioners to leave in obedience to the directive of the city officials. He told them that "I am not allowed to serve you here. . . . We *have* to sell to you at the rear of the store where we have a colored counter." (Emphasis supplied.) And he called the police "[a]s a matter of routine procedure." The petitioners testified that when they did not leave, the restaurant manager whistled and the employees removed the stools, turned

---

"I have carefully reviewed the reports of these two initial demonstrations by a small group of misguided white and Negro students, or former students. It is my considered opinion that regardless of the avowed purpose or intent of the participants, the effect of such demonstrations is not in the public interest of this community.

"Act 70 of the 1960 Legislative session redefines disturbing the peace to include 'the commission of any act as would foreseeably disturb or alarm the public.'

"Act 70 also provides that persons who seek to prevent prospective customers from entering private premises to transact business shall be guilty of disorderly conduct and disturbing the peace.

"Act 80—obstructing public passages—provides that 'no person shall wilfully obstruct the free, convenient, and normal use of any public sidewalk, street, highway, road, bridge, alley or other passage way or the entrance, corridor or passage of any public building, structure, water craft or ferry by impeding, hindering, stifling, retarding or restraining traffic or passage thereon or therein.'

"It is my determination that the community interest, the public safety, and the economic welfare of this city require that such demonstrations cease and that henceforth they be prohibited by the police department."

off the lights, and put up a sign saying that the counter was closed. One petitioner stated that "it appeared to be a very efficient thing, everyone knew what to do." The store manager conceded that his decision to operate a segregated facility "conform[ed] to state policy and practice" as well as local custom. When asked whether "in the last 30 days to 60 days [he had] entered into any conference with other department store managers here in New Orleans relative to sit-in problems," the store manager stated: "[w]e have spoken of it." The above evidence all tended to indicate that the store officials' actions were coerced by the city. But the evidence of coercion was not fully developed because the trial judge forbade petitioners to ask questions directed to that very issue.

But we need not pursue this inquiry further. A State, or a city, may act as authoritatively through its executive as through its legislative body. See *Ex parte Virginia*, 100 U. S. 339, 347. As we interpret the New Orleans city officials' statements, they here determined that the city would not permit Negroes to seek desegregated service in restaurants. Consequently, the city must be treated exactly as if it had an ordinance prohibiting such conduct. We have just held in *Peterson* v. *City of Greenville, ante,* p. 244, that where an ordinance makes it unlawful for owners or managers of restaurants to seat whites and Negroes together, a conviction under the State's criminal processes employed in a way which enforces the discrimination mandated by that ordinance cannot stand. Equally the State cannot achieve the same result by an official command which has at least as much coercive effect as an ordinance. The official command here was to direct continuance of segregated service in restaurants, and to prohibit any conduct directed toward its discontinuance; it was not restricted solely to preserve the public peace in a nondiscriminatory fashion in a situation where violence

was present or imminent by reason of public demonstrations. Therefore here, as in *Peterson,* these convictions, commanded as they were by the voice of the State directing segregated service at the restaurant, cannot stand. *Turner* v. *City of Memphis,* 369 U. S. 350.

*Reversed.*

[For opinion of MR. JUSTICE HARLAN, see *ante,* p. 248.]

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, I have concluded it necessary to state with more particularity why Louisiana has become involved to a "significant extent" (*Burton* v. *Wilmington Parking Authority,* 365 U. S. 715, 722) in denying equal protection of the laws to petitioners.

I.

The court below based its affirmance of these convictions on the ground that the decision to segregate this restaurant was a private choice, uninfluenced by the officers of the State. *State* v. *Goldfinch,* 241 La. 958, 132 So. 2d 860. If this were an intrusion of a man's home or yard or farm or garden, the property owner could seek and obtain the aid of the State against the intruder. For the Bill of Rights, as applied to the States through the Due Process Clause of the Fourteenth Amendment, casts its weight on the side of the privacy of homes. The Third Amendment with its ban on the quartering of soldiers in private homes radiates that philosophy. The Fourth Amendment, while concerned with official invasions of privacy through searches and seizures, is eloquent testimony of the sanctity of private premises. For even when the police enter private precincts they must, with rare exceptions, come armed with a warrant issued by a magis-

trate. A private person has no standing to obtain even limited access. The principle that a man's home is his castle is basic to our system of jurisprudence.

But a restaurant, like the other departments of this retail store where Negroes were served, though private property within the protection of the Fifth Amendment, has no aura of constitutionally protected privacy about it. Access by the public is the very reason for its existence.

> "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh* v. *Alabama,* 326 U. S. 501, 506.

The line between a private business and a public one has been long and hotly contested. *New State Ice Co.* v. *Liebmann,* 285 U. S. 262, is one of the latest cases in a long chain. The Court, over the dissent of Mr. Justice Brandeis and Mr. Justice Stone, held unconstitutional an Oklahoma statute requiring those manufacturing ice for sale and distribution to obtain a license from the State. Mr. Justice Brandeis' dissent was in the tradition of an ancient doctrine perhaps best illustrated [1] by *German Alliance Ins. Co.* v. *Kansas,* 233 U. S. 389, which upheld a Kansas statute that regulated fire insurance rates. Mr. Justice McKenna, writing for the Court, said, "It is the business that is the fundamental thing; property is but its instrument, the means of rendering the service which has become of public interest." *Id.,* 408. Cf. *Ferguson* v. *Skrupa,* 372 U. S. 726.

Some of the cases reflect creative attempts by judges to make innkeepers, common carriers, and the like per-

---

[1] See Hamilton, Affectation with Public Interest, 39 Yale L. J. 1089, 1098–1099.

form the public function of taking care of all travelers.[2] Others involve the power of the legislature to impose various kinds of restraints or conditions on business. As a result of the conjunction of various forces, judicial and legislative, it came to pass that "A large province of industrial activity is under the joint sovereignty of the market and the state."[3]

The present case would be on all fours with the earlier ones holding that a business may be regulated when it renders a service which "has become of public interest" (*German Alliance Ins. Co.* v. *Kansas, supra,* 408) if Louisiana had declared, as do some States,[4] that a business may not refuse service to a customer on account of race and the proprietor of the restaurant were charged with violating this statute. We should not await legislative action before declaring that state courts cannot enforce this type of segregation. Common-law judges fashioned the rules governing innkeepers and carriers.[5]

[2] See Jeremy, The Law of Carriers, Inn-Keepers, etc. (1815), 4–5, 144–147; Tidswell, The Innkeeper's Legal Guide (1864), c. 1; Schouler, Law of Bailments (2d ed. 1887), §§ 274–329, 330–341; Beale, The Law of Innkeepers and Hotels (1906), *passim;* 1 Wyman, Public Service Corporations (1911), §§ 1–5; Burdick, The Origin of the Peculiar Duties of Public Service Companies, 11 Col. L. Rev. 514, 616; Arterburn, The Origin and First Test of Public Callings, 75 U. of Pa. L. Rev. 411.

[3] Hamilton, *supra,* note 1, p. 1110.

[4] See, *e. g.,* McKinney's Cons. N. Y. Laws, Vol. 8, Art. 4; *id.,* Vol. 18, Art. 15; N. J. Stat. Ann., Tit. 10; *id.,* Tit. 18, c. 25; Cal. Civ. Code § 51. Cf. Cal. Health and Safety Code, §§ 35700. (1962 Supp.) *et seq.; Burks* v. *Poppy Constr. Co.,* 57 Cal. 2d 463, 370 P. 2d 313; *Martin* v. *New York,* 22 Misc. 2d 389, 201 N. Y. S. 2d 111. See generally, Greenberg, Race Relations and American Law, 101–114 (1959); 7 St. Louis U. L. J. 88 (1962).

[5] See Schouler, *op. cit., supra,* note 2, §§ 274, 335; Wyman, *op. cit., supra,* note 2, § 1; Arterburn, *supra,* note 2.

As stated by Holt, C. J., in *Lane* v. *Cotton*, 12 Mod. 472, 484 (1701):

> "Wherever any subject takes upon himself a public trust for the benefit of the rest of his fellow-subjects, he is *eo ipso* bound to serve the subject in all the things that are within the reach and comprehension of such an office, under pain of an action against him . . . . If on the road a shoe fall off my horse, and I come to a smith to have one put on, and the smith refuse to do it, an action will lie against him, because he has made profession of a trade which is for the public good, and has thereby exposed and vested an interest of himself in all the king's subjects that will employ him in the way of his trade. If an innkeeper refuse to entertain a guest where his house is not full, an action will lie against him, and so against a carrier, if his horses be not loaded, and he refuse to take a packet proper to be sent by a carrier." [6]

Judges who fashioned those rules had no written constitution as a guide. There were, to be sure, criminal statutes that regulated the common callings.[7] But the civil remedies were judge made. We live under a constitution that proclaims equal protection of the laws. That standard is our guide. See *Griffin* v. *Illinois,* 351 U. S. 12; *Douglas* v. *California,* 372 U. S. 353. And under that standard business serving the public cannot seek the aid

---

[6] See also *White's Case* (1558), 2 Dyer 158:b.; *Warbrooke* v. *Griffin* (1609), 2 Brownl. 254; *Bennett* v. *Mellor* (1793), 5 Term Rep. 273; *Thompson* v. *Lacy* (1820), 3 B. & Ald. 283.

For criminal prosecutions, see, *e. g., Rex* v. *Ivens* (1835), 7 Car. & P. *213; *Regina* v. *Sprague* (1899), 63 J. P. 233.

For a collection of the English cases, see 21 Halsbury's Laws of England (3d ed. 1957) 441 *et seq.;* 10 Mews' Dig. Eng. Cas. L. to 1924, pp. 1463 *et seq.*

[7] Arterburn, *supra,* note 2.

of the state police or the state courts or the state legislatures to foist racial segregation in public places under its ownership and control. The constitutional protection extends only to "state" action, not to personal action. But we have "state" action here, wholly apart from the activity of the Mayor and police, for Louisiana has interceded with its judiciary to put criminal sanctions behind racial discrimination in public places. She may not do so consistently with the Equal Protection Clause of the Fourteenth Amendment.

The criminal penalty (60 days in jail and a $350 fine) was imposed on these petitioners by Louisiana's judiciary. That action of the judiciary was state action. Such are the holdings in *Shelley* v. *Kraemer*, 334 U. S. 1, and *Barrows* v. *Jackson,* 346 U. S. 249.[8] Those cases involved restrictive covenants. *Shelley* v. *Kraemer* was a civil suit to enjoin violation of a restrictive covenant by a Negro purchaser. *Barrows* v. *Jackson* was a suit to collect damages for violating a restrictive covenant by selling residential property to a Negro. Those cases, like the present one, were "property" cases. In those cases, as in the present one, the line was drawn at dealing with Negroes. There, as here, no state legislature was involved, only the state judiciary. The Court said in *Shelley* v. *Kraemer:*

> "That the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court." 334 U. S., at 14.

The list of instances where action of the state judiciary is state action within the meaning of the Fourteenth Amendment is a long one. Many were noted in *Shelley*

---

[8] See also *Abstract Investment Co.* v. *Hutchinson,* 204 Cal. App. 2d 242, 251, 22 Cal. Rptr. 309, 317; 10 U. C. L. A. L. Rev. 401.

v. *Kraemer,* 334 U. S., at 14–18. Most state convictions in violation of the First, Fourth, or Fifth Amendment, as incorporated in the Due Process Clause of the Fourteenth Amendment, have indeed implicated not the state legislature but the state judiciary, or the state judiciary and the state prosecutor and the state police. *Shelley* v. *Kraemer*—and later *Barrows* v. *Jackson*—held that the state judiciary, acting alone to enforce private discrimination against Negroes who desired to buy private property in residential areas, violated the Equal Protection Clause of the Fourteenth Amendment.

Places of public accommodation such as retail stores, restaurants, and the like render a "service which has become of public interest" (*German Alliance Ins. Co.* v. *Kansas, supra,* 408) in the manner of the innkeepers and common carriers of old. The substance of the old common-law rules has no direct bearing on the decision required in this case. Restaurateurs and owners of other places of amusement and resort have never been subjected to the same duties as innkeepers and common carriers.[9] But, what is important is that this whole body of law was a response to the felt needs of the times that spawned it.[10] In our time the interdependence of people has greatly increased; the days of *laissez faire* have largely disappeared; men are more and more dependent on their neighbors for services as well as for housing and the other necessities of life. By enforcing this criminal mischief statute, invoked in the manner now before us, the Louisiana courts are denying some people access to the mainstream of our highly interdependent life solely

---

[9] See *Marrone* v. *Washington Jockey Club,* 227 U. S. 633; *Madden* v. *Queens County Jockey Club,* 296 N. Y. 249, 72 N. E. 2d 697; *Alpaugh* v. *Wolverton,* 184 Va. 941, 36 S. E. 2d 906; *Nance* v. *Mayflower Tavern,* 106 Utah 517, 150 P. 2d 773.

[10] Wyman, *op. cit., supra,* note 2, §§ 1, 2–16, 330; Schouler, *op. cit., supra,* note 2, §§ 274, 335; Beale, *op. cit., supra,* note 2, c. I; Arterburn, *supra,* note 2, 420–426.

because of their race. Yet, "If there is any one purpose of the Fourteenth Amendment that is wholly outside the realm of doubt, it is that the Amendment was designed to bar States from denying to some groups, on account of their race or color, any rights, privileges, and opportunities accorded to other groups." *Oyama* v. *California*, 332 U. S. 633, 649 (concurring opinion).

An innkeeper or common carrier has always been allowed to exclude drunks, criminals and diseased persons, but only because the public's interest in protecting his and his guests' health and property outweighs its interest in providing accommodations for this small group of travelers.[11] As a general rule, innkeepers and carriers cannot refuse their services on account of race; though the rule developed in this country that they can provide "separate but equal" facilities.[12] And for a period of our history even this Court upheld state laws giving sanction to such a rule. Compare *Plessy* v. *Ferguson*, 163 U. S. 537, with *Gayle* v. *Browder*, 352 U. S. 903, affirming, 142 F. Supp. 707. But surely *Shelley* v. *Kraemer, supra,* and *Barrows* v. *Jackson, supra,* show that the day has passed when an innkeeper, carrier, housing developer, or retailer can draw a racial line, refuse service to some on account of color, and obtain the aid of a State in enforcing his personal bias by sending outlawed customers to prison or exacting fines from them.

Business, such as this restaurant, is still private property. Yet there is hardly any private enterprise that does not feel the pinch of some public regulation—from price control, to health and fire inspection, to zoning, to safety measures, to minimum wages and working con-

[11] Wyman, *op. cit., supra,* note 2, c. 18; Schouler, *op. cit., supra,* note 2, §§ 320, 322.

[12] Compare, *e. g., Constantine* v. *Imperial Hotels,* [1944] 1 K. B. 693; Wyman, *op. cit., supra,* note 2, §§ 361, 565, 566, with *State* v. *Steele,* 106 N. C. 766, 782, 11 S. E. 478, 484.

ditions, to unemployment insurance. When the doors of a business are open to the public, they must be open to all regardless of race if *apartheid* is not to become engrained in our public places. It cannot by reason of the Equal Protection Clause become so engrained with the aid of state courts, state legislatures, or state police.[13]

## II.

There is even greater reason to bar a State through its judiciary from throwing its weight on the side of racial discrimination in the present case, because we deal here with a place of public accommodation under license from the State. This is the idea I expressed in *Garner* v. *Louisiana,* 368 U. S. 157, where another owner of a restaurant refused service to a customer because he was a Negro. That view is not novel; it stems from the dissent of the first Mr. Justice Harlan in the *Civil Rights Cases,* 109 U. S. 3, 58–59:

> "In every material sense applicable to the practical enforcement of the Fourteenth Amendment, railroad corporations, keepers of inns, and managers of places of public amusement are agents or instrumentalities of the State, because they are charged with duties to the public, and are amenable, in respect of their duties and functions, to governmental regulation. It seems to me that, within the principle settled in *Ex parte Virginia,* a denial, by these instrumentalities of the State, to the citizen, because of his race, of that equality of civil rights secured to him by law, is a denial by the State, within the meaning of the Fourteenth Amendment. If it be not, then that race

---

[13] See generally, Pollitt, Dime Store Demonstrations: Events and Legal Problems of First Sixty Days, 1960 Duke L. J. 315, 350–365; Henkin, *Shelley* v. *Kraemer:* Notes for a Revised Opinion, 110 U. of Pa. L. Rev. 473.

is left, in respect of the civil rights in question, practically at the mercy of corporations and individuals wielding power under the States."

The nexus between the State and the private enterprise may be control, as in the case of a state agency. *Pennsylvania* v. *Board of Trusts,* 353 U. S. 230. Or the nexus may be one of numerous other devices. "State support of segregated schools through any arrangement, management, funds, or property cannot be squared" with the Equal Protection Clause. *Cooper* v. *Aaron,* 358 U. S. 1, 19. Cf. *Hampton* v. *Jacksonville,* 304 F. 2d 320. A state-assisted enterprise serving the public does not escape its constitutional duty to serve all customers irrespective of race, even though its actual operation is in the hands of a lessee. *Burton* v. *Wilmington Parking Authority,* 365 U. S. 715. Cf. *Boynton* v. *Virginia,* 364 U. S. 454. State licensing and surveillance of a business serving the public also brings its service into the public domain. This restaurant needs a permit from Louisiana to operate; [14] and during the existence of the license the State has broad powers of visitation and control.[15] This restaurant is

---

[14] Under the provisions of Article 7.02 of the Sanitary Code, promulgated by the State Board of Health pursuant to La. Rev. Stat. § 40:11, no person shall operate a public eating place of any kind in the State of Louisiana unless he has been issued a permit to operate by the local health officer; and permits shall be issued only to persons whose establishments comply with the requirements of the Sanitary Code.

[15] Under La. Rev. Stat., Title 40, §§ 11, 12, 15, 16, 52, and 69, state and local health officials closely police the provisions of the Sanitary Code. They may "enter, examine, and inspect all grounds, structures, public buildings, and public places in execution of a warrant issued in accordance with the constitution and laws of Louisiana," and "arrest . . . all persons violating any rule or regulation of the board or any article or provision of the sanitary code . . . ." Penalties are provided for code violations. See also New Orleans City Code, 1956, §§ 29–55, 56, and 58; Home Rule Charter of the City of New Orleans, § 4–1202 (2).

thus an instrumentality of the State since the State charges it with duties to the public and supervises its performance. The State's interest in and activity with regard to its restaurants extends far beyond any mere income-producing licensing requirement.

There is no constitutional way, as I see it, in which a State can license and supervise a business serving the public and endow it with the authority to manage that business on the basis of *apartheid,* which is foreign to our Constitution.