170 So.2d 417

**Constance Dalphne BANKS et al.**

v.

**STATE.**

**7 Div. 723.**

Court of Appeals of Alabama.

Oct. 6, 1964.

Rehearing Denied Oct. 27, 1964.

**520**

Arthur Shores, Birmingham, for appellants.

Richard M. Flowers, Atty. Gen., and Winston Huddleston, Sp. Asst. Atty. Gen., for the State.

CATES, Judge.

These are six consolidated appeals by Negroes convicted of remaining on the premises of the City Pharmacy in Talladega after being requested by one of the owners to leave. Code 1940, T. 14, § 426.[1]

The sole question—but not briefed by the appellants—is whether or not the prosecution of the defendants was private or State action. By "State action" we include such pervasive devices as have been found to bear on or discommode private business so as to contribute to segregation through organs of the State, including its creatures. See Peterson v. Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323, and Robinson v. Florida, 378 U.S. 153, 84 S.Ct. 1693, 12 L.Ed.2d 771.

The facts here rest on the testimony of two State witnesses: M. B. Orr, a partner in the Pharmacy, and Ed Bishop, a Talladega City police sergeant, whom Orr summoned from patrolling the Courthouse Square when the six defendants entered his store.

The six appellants are young Negroes, three of each sex, who, on April 10, 1962, entered the City Pharmacy in Talladega and seated themselves at the soda fountain. They asked Orr for a round of cokes.

Orr referred to a sign hanging from a wall that the establishment reserved "the right to refuse service to any person." He told the appellants that it was "a private business, * * * privately owned and privately operated and private property."

Addressing appellant Banks, after reiterating his reservation of being under no correlative duty to furnish the cokes, Orr told her, "I am refusing to serve you, and I would like for you to leave." Someone in the group said, "We prefer to remain."

By this time a crowd of at least two hundred persons had gathered outside the City Pharmacy. The witness adopted the solicitor's characterization of the crowd as being "menacing."

Meanwhile, Sgt. Bishop came into the store. The second time Orr asked the appellants to leave the premises, Bishop was then standing at one end of the soda fountain. Orr testified, "I turned to Sgt. Bishop and I told him that he had heard me ask them to leave in his presence and he had seen their apparent failure to do so and that I would like for him to see if he could make them leave and if he couldn't would he place them under arrest."

Bishop said, "You have heard the proprietor ask you to leave. Now, I am asking you to leave." On the appellants remaining seated and silent, Bishop placed them under arrest.

He needed no warrant to do so because the misdemeanor had been committed in his presence when the appellants refused to heed Orr's request. Code 1940, T. 15, § 154.[2]

---

1. Code 1940, T. 14, § 426: " * * * any person, who, having entered into * * * or on the premises of another * * * and fails or refuses, without legal cause or good excuse, to leave immediately on being ordered or requested to do so by the person in possession, his agent or representative, shall, on con-

viction, be fined not more than one hundred dollars, and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than three months."

2. Code 1940, T. 15, § 154: "An officer may also arrest any person, without warrant, on any day and at any time, for

That Bishop gave them additional opportunity to comply was merely a matter of grace insofar as his taking them into custody was called for. Had Orr gone to the City Recorder (or other magistrate) and made oath for a warrant of arrest, the arresting officer would not have had to have been present. Bishop's being present dispensed with the need for a warrant prior to arrest.

The defendants filed a written motion to exclude the evidence because they were "peacefully upon the premises of an establishment performing an economic function invested with the public interest, as a customer, visitor, business guest or invitee." The ground cited continues that there is no basis for the charged refusal other than it came from a request motivated solely because of the defendant's race or color.[3]

Aside from the views of Mr. Justice Douglas (and possibly of Warren, C. J.,

and Goldberg, J.) that property used in business is subject to a public interest (e. g., Lombard v. Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338, and Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822), we are not aware of any holding that, before the passage of the Civil Rights Act of 1964, a private shopkeeper may not, if he pleases, discriminate invidiously against anyone even though for reasons of the would be customer's race, color, etc. If the choice is unguided by the State, the Fourteenth Amendment is not activated.

All the defense elicited from Orr was that he refused to serve the defendants because of self-interest in his economic survival and because the defendants' came into his store as part of a program of using private premises as a sounding board for a "demonstration." The gathering of a menacing crowd lends logic to his looking out for himself.

any public offense committed, or a breach of the peace threatened in his presence;
* * *."

3. Orr, on cross-examination, had testified:
"Q Do you ordinarily serve cokes at your lunch counter?
"A As a general rule.
"Q I believe you said you and your partner had discussed the matter of serving Negroes and arrived at a policy that you would not serve them at your lunch counter?
"A On this particular occasion.
"Q Which occasion?
"A On April 10, 1962, you see we were forewarned as to what was going to happen.
"Q What was the basis on which you arrived at your policy to not serve Negroes?
"A There was more than one; first, we wanted to protect our business, I suppose for selfish reason, that was the first one. Secondly, we wanted to maintain law and order.
"Q Was it due to the race of these particular individuals, that they were Negroes, that you would not serve them because they were Negroes and that if you served them it might injure your business?
"A Not necessarily though; it was under prevailing circumstances at the time. There had been wide publicity

to the effect there was going to be demonstrations. That was words I heard over the radio; that was words I heard from phone calls, I don't know who those persons were, one identified themselves as being connected with Associate Press. So to us it was merely demonstrations rather than a legitimate request for a particular item.
"Q Prior to April 10th, had you ever served Negroes at your lunch counter?
"A Yes, sir.
"Q I mean seated?
"A No, they weren't seated.
"Q In other words, prior to April your policy was to serve Negroes and let them take out or stand in other parts of the store after they had been served at the lunch counter?
"A Not necessarily, we didn't set policy at that time because we had never had a request, or had any indication there would be a request. Therefore, we couldn't set a policy.
"Q You say no Negro had sat at your counter and was served and ate at your counter?
"A Not to my knowledge.
"Q Would you say that—that was not based on any ordinance in the City? You don't have an ordinance so far as you know to prohibit you from serving Negroes at your lunch counter?
"A So far as I know there is none. I have never been informed of one."

Except for those of Birmingham (Act No. 193, Gen.Laws 1943, p. 183, June 18, 1943), Mobile and Montgomery (Act No. 242, Laws 1961, Sp.Sess., p. 2256, September 15, 1961), municipal ordinances do not come within the realm of judicial notice. Carter v. City of Gadsden, 264 Ala. 544, 88 So.2d 689.

This record is devoid of any attempt by the defense to show that the police department of the City of Talladega, or any other public official to any extent whatsoever had manifested any concern as to whether or not the proprietors of the City Pharmacy served or refused to serve Negroes.

Neither statute, nor pertinent regulation, nor declaration of a public official having authority in or for Talladega County has been called to our attention so as to bring this case under Peterson v. Greenville, supra, or Lombard v. Louisiana, supra, or Robinson v. Florida, supra.

Gober v. City of Birmingham, 41 Ala. App. 313, 133 So.2d 697, was apparently reversed (373 U.S. 374, 83 S.Ct. 1311, 10 L.Ed.2d 419) because of the unrepealed status at the time of Gober's sit-in of § 369 of the General City Code requiring racial separation in restaurants.

That part of what Judge Harwood said in Gober as to the use of private property still stands, indeed seems reinforced by Bell v. Maryland, supra. From the Gober opinion, supra, 41 Ala.App. at p. 317, 133 So.2d at p. 701, we quote:

"As we interpret the argument of counsel for appellant, its tenor may well be illustrated by the following quotations from the brief:

" 'Due process and equal protection demand that a Negro be accorded the right to sit at eating counters of privately owned businesses, if he has been a customer in other departments of the store.

\* \* \* \* \* \*

" 'That the premises were privately owned should not detract from the high constitutional position which such free expression deserves.'

"We know of no warrant in law validating the principles asserted by counsel.

"As aptly stated in Browder v. Gayle, D.C., 142 F.Supp. 707, 714:

" 'In their private affairs, in the conduct of their private businesses, it is clear that the people themselves have the liberty to select their own associates and the persons with whom they will do business, unimpaired by the Fourteenth Amendment. The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835. Indeed we think that such liberty is guaranteed by the due process [clause] of that Amendment.'

"Even so, there is no question presented in the record before us, by the pleading, of any statute or ordinance requiring the separation of the races in restaurants. The prosecution was for a criminal trespass on private property.

"The Pizitz Department Store is a private business—a private enterprise. It has no connection with any governmental agency, federal, State, County or city.

"The appellant entered upon the privately owned and operated premises of the store as a licensee by implied invitation. He had no interest in the premises. While a distinction exists between a licensee and an invitee in so far as liability for negligence on the part of the owner of the premises is concerned, the principle governing appellant's conduct in the present consideration must be governed by the rules pertaining to licensees, for in general, that is the position he occupied even though on the premises by an implied invitation.

"The Pizitz store, being the owner of its premises, had a full right to limit the use of its own premises as it saw fit.

"By its own choice it could limit the use of any part of its premises. It exercised this right to limit the use of its restaurant.

"In the absence of statute, a restaurant owner may accept or reject customers on purely personal choice. Nance v. Mayflower Tavern, 106 Utah 517, 150 P.2d 773; Noble v. Higgins, 95 Misc. 328, 158 N.Y.S. 867.

"The right to operate a restaurant on its own premises under such conditions as it saw fit to impose was an inalienable property right possessed by the Pizitz store. The appellant would destroy this property right by attempting to misapply the Fourteenth Amendment, ignoring the provision in that Amendment that grants the right to a private property owner to the full use of his property, that is: 'Nor shall any State deprive any person of life, *liberty, or property,* without due process of law.' (Italics ours.)

"As stated in Williams v. Howard Johnson Restaurant, 4 Cir., 268 F.2d 845, 847, there is an 'important distinction between activities that are required by the state and those which are carried out by voluntary choice and without compulsion by the people of the state in accordance with their own desires and social practices.'

"It is fundamental, and requires no citation of authority, that the grantor of a license, which has not become coupled with an interest, may revoke the license at will.

"When the appellant was requested to leave the restaurant by an official of the Pizitz store, and refused to leave, his status as an invited licensee was destroyed, and he was thereafter on the premises as a trespasser. As stated in Martin v. City of Struthers, 319 U.S. 141, 147, 63 S.Ct. 862, 865, 87 L.Ed. 1313:

" 'Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off.'

"Boynton v. Com. of Virginia, 364 U.S. 454, 81 S.Ct. 182, 5 L.Ed.2d 206, relied on by the appellant, was decided on the basis of the Federal Interstate Commerce Act, and is to the effect that said act prohibits the exclusion of Negroes from restaurants operated or controlled by an interstate carrier as a part of its business. This doctrine cannot be said to create a constitutional right to trespass on private property, regardless of race.

"Likewise, we find the doctrine of Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, inapplicable to the present case. The Marsh case, supra, concerned the right to distribute religious pamphlets on the sidewalk of a company owned town. As stated by the court, this town though owned by a company, had 'all the characteristics of any other American town' in so far as municipal functions were concerned, and therefore should be subjected to constitutional limitations imposed on regular public municipalities. Here we are concerned with a private owner in the use of his private property."

Apart from the special concurring opinions of Douglas and Goldberg, JJ., in Bell v. Maryland, supra, no member of the present court has gainsaid what Black, J., wrote there for himself and Harlan and White, JJ., in dissent:

" * * * The Amendment does not forbid a State to prosecute for crimes committed against a person or his property, however prejudiced or narrow the victim's views may be. * * * The worst citizen no less than the best is entitled to equal protection of the

laws of his State and of his Nation. * * *

* * * * * *

" * * * the Solicitor General argues, 'a State which has drawn a color line may not suddenly assert that it is color blind.' We cannot accept such an *ex post facto* argument to hold the application here of Maryland's trespass law unconstitutional. Nor can we appreciate the fairness or justice of holding the present generation of Marylanders responsible for what their ancestors did in other days—even if we had the right to substitute our own ideas of what the Fourteenth Amendment ought to be for what it was written and adopted to achieve.

* * * * * *

" * * * We do not believe that section 1 of the Fourteenth Amendment was written or designed to interfere with a storekeeper's right to choose his customers or with a property owner's right to choose his social or business associates, so long as he does not run counter to valid state or federal regulation. * * *"

Footnote 44: "The opinion of our Brother GOLDBERG characterizes our argument as being that the Constitution 'permits' Negroes to be denied access to restaurants on account of their color. We fear that this statement might mislead some readers. Precisely put, our position is that the Constitution of itself does not prohibit discrimination by those who sell goods and services. There is of course a crucial difference between the argument—which we do make—that the Constitution itself does not prohibit private sellers of goods or services to choose their own customers, and the argument—which we do not make—that the Constitution affirmatively creates a right to discriminate which neither state nor federal legislation could impair."

The judgments of the circuit court convicting the defendants are due to be

Affirmed.

## On Rehearing

The appellant asks us to take Title II of the Civil Rights Act of 1964 as an act of amnesty.

Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1697, 12 L.Ed.2d 822, refers to the common law doctrine of oblivion. The capacity to forget or forgive presupposes the same lawgiver, e. g., the King in Parliament.

To examine the principle as here sought to be put in effect requires two enquiries:

1. Does the law of Alabama, decisional or statute, contemplate retrospective amnesty when a Federal Act pre-empts?

2. Has the Congress expressed an intent in Title II to make prior violations of otherwise valid State laws innocent?

Code 1940, T. 1, § 11, reads in part as follows:

"No repeal, revision, amendment, or alteration of any law shall in any manner affect any prosecution for an offense committed under the law so repealed, revised, amended, or altered, unless the repealing, revising, amending, or altering law shall otherwise expressly provide; but *every* such *prosecution*, whether begun before or after the enactment of such repealing, revising, amending, or altering law, *is governed by the law under which the offense was committed*; * * *" (Italics supplied.)

This wording, by reason of the clause italicized, is explicit where the Maryland Act (1 Md.Code, § 3) in Bell, supra, was vague.

This section clearly establishes the mete-wand as status quo ante delictum. More-

over, it is no arrogation of a supposed right to exposit the meaning of Federal acts.

Ordinarily the prohibition of ex post facto laws is a one-way street. This section 11, however, requires language to apprise the individual lawmakers of the direction of what will follow enactment. No doubt the same distrust that led to § 45 of the Constitution inspired the adoption of § 11, supra.

In City of Birmingham v. Baranco, 4 Ala.App. 279, 58 So. 944, the decision rejected one level of government's, the State, legislating without express words to forego cases under a later repealed city ordinance. Though effect was given to a general saving clause in the city's by-laws, § 11, supra, was held not to apply to quasi criminal cases for the violation of municipal ordinances.

While the city, under some views, is merely a subordinant creature of the state, certainly the state is a component, and not an offspring, of the United States. Theory aside, we do not consider that even under Code 1940, T. 15, § 90, the Legislature of this State has shown any intention to withdraw nunc pro tunc prosecutions where Congress might legislate.

Similarly, after careful scrutiny of the Civil Rights Act, the Committee Report, and debates, we fail to find any expression that the Congress wished to wipe out prior State prosecutions.

Congress has used "shall" throughout Title II. This we take as normally implying a prospective command.

We have found no basis to construe § 201(b) and (d) as reaching back so as to void state court judgments not made final when the Civil Rights Act became law. The fortuitous event of finality or non-finality being the open (or shut) sesame to a prison cell seems so irrational as to demand unmistakable wording.[4]

Application overruled.

---

4. Section 1104 states in part: " * * * nor shall any provision of this Act be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this Act, or any provision thereof."