280 So.2d 831

**Carlos Miguel HERNANDEZ, alias**

v.

**STATE.**

**I Div. 263.**

Court of Criminal Appeals of Alabama.

May 15, 1973.

Rehearing Denied June 12, 1973.

William J. Baxley, Atty. Gen., and Herbert H. Henry, Asst. Atty. Gen., for the State.

---

J. D. Quinlivan, Jr., Mobile, for appellant.

**HARRIS, Judge.**

Hernandez was convicted for transporting marihuana and sentenced to a term of fifteen (15) years in the penitentiary.

On the morning of June 16, 1969, appellant drove his Chrysler automobile to a service station on the Halls Mill Road in Mobile, Alabama. The service station building was being painted at the time and there were several painters on the premises. Appellant drove away and returned several times. The last time he returned, he backed his car into the station, got out and walked up to one of the painters and

said, "If I catch a plane and go back to Miami, will you not kill me?" The painter told him he did not have time to kill him and to go on and leave him alone. His abnormal behavior was such that the station manager called the Police Department and told the operator that he "had a nut or something at the service station and that he was harassing some painters", and requested them to send an officer out to make the man leave.

Police officer Robert Sieck was dispatched to investigate this complaint. Appellant left the station before this officer arrived. While Sieck was interviewing the station manager, appellant drove by again and the manager pointed him out to the officer who got in his marked squad car and drove after appellant. Appellant drove in a parking lot a short distance away and turned around. He met the officer and both stopped their cars. The officer radioed for a "back up" squad car and while he was talking on the police radio, appellant walked up to the driver's side of the squad car and handed the officer his keys and said, "What you want is in the trunk."

From the record:

"A. Well, I told him, 'Wait a minute.' I was still talking on the radio and the operator was calling me back and he insisted on giving me the key so I took it.

"Q. All right. Now, were you still seated in your car?

"A. Yes, sir. I was sitting in the car.

"Q. All right. What did you do with the keys after you got them?

"A. I put them in my pocket, I believe. If I remember right I put them in my shirt pocket.

"Q. What was the defendant doing?

"A. He was standing outside the car.

"Q. All right. Now, what did you do?

"A. I got through talking to the operator and I got out of the car and stood up along side of him and asked him what his problem was. He got to jabbering on about what I wanted was in the trunk and he knew what I was after and everything and said something about they was trying to get him and they had microphones and everything stuck up in his car. We walked over to his car and he had the back seat of his car, he showed me where he had tore the upholstery out of his back seat of his car.

"Q. He showed you this?

"A. Yes, sir.

"Q. From the inside of the car?

"A. From the outside. We were standing on the outside. He showed me, said they had microphones in the car and everything.

"Q. Did you see any microphones?

"A. No, sir.

"Q. Did you attempt to go in to the car to see if any were in there?

"A. No, sir. I just looked down in there at it and what not.

"Q. All right, sir.

"A. And he kept telling me what I wanted was in the trunk and I asked him what he had in the trunk.

"Q. All right, sir. What did he say?

"A. He said, I got a trunk load of marijuana.

"Q. All right. Now, what did you do when he first said that?

"A. Well, when he told me he had a trunk load of marijuana I just went back to the car and I called the sergeant to the—

"Q. Who is the sergeant?

"A. Sergeant Wellford.

"Q. What's his first name?

"A. Ollie Wellford.

"Q. Now, what did you tell Sergeant Wellford?

"A. I told him he either had a nut over here or something big. I didn't know what.

"Q. All right, sir. Now, how long was it that you and the defendant confronted each other and had the conversation before you went and called Sergeant Wellford? How long did it take for this to transpire, look for the microphones, and the whole thing you testified about?

"A. About five or ten minutes at the most.

"Q. Now, when you called Sergeant Wellford, what was the defendant doing, or what did you do with the defendant?

"A. I didn't do nothing with him. He was just standing there.

"Q. Did you ask him any further questions?

"A. No. I called the sergeant and what not, and waited around for the sergeant to get over there.

"Q. All right. What did the defendant do while you were waiting for Sargeant Wellford?

"A. He just stood there with me.

"Q. Did you have any conversation with him?

"A. Oh, we had a little small talk and what not.

"Q. Did you ask him anything about the marijuana in the trunk?

"A. No.

"Q. All right, sir. How long was it before Sergeant Wellford got there?

"A. Probably another ten or fifteen minutes. I don't know just off hand right now.

"Q. Now, had you placed the defendant under arrest?

"A. No, sir.

"Q. All right, sir. Now, when Sergeant Wellford got there was he alone or with somebody else?

"A. He was by himself.

"Q. All right. Now, what happened when he got there?

"A. I told Sergeant Wellford what the man told me.

"Q. All right, sir.

"A. He said he had a trunk load of marijuana in there and Sergeant Wellford told me, said, 'Let's find out.'

"Q. All right. And what did y'all do?

"A. We went and opened the trunk up.

"Q. All right. Using what to open it?

"A. The key.

"Q. That the defendant had given you?

"A. He had given it to me. The key he gave me.

"Q. Now, when you opened the trunk of the defendant's car what did you see?

"A. Large—well, packages, brown paper bags about that long, about that wide, and about that long.

"Q. Now, for the record, could you give us a description of the packages again using—

"A. About a foot long maybe. Five inches wide and a couple of inches thick.

"Q. Now, how many of these did you see approximately in the car?

"A. The trunk was full of them. It was packed full.

"Q. All right. Did you notice anything unusual about the packages or anything unusual when you first opened the trunk?

"A. Well, it had a real strong odor.

"Q. All right. Was it a recognizable odor to you?

"A. Well, no. Not really. It was just a wild odor to it and I got hay fever and it bothers me.

"Q. All right. What did you do when you first opened the trunk and saw this? Did you take any of the packages out of the trunk?

"A. I took one package tore the corner on it to see what was in it and smelled it and showed it to Sergeant Wellford.

"Q. All right, sir. You tore the corner, did you expose the contents of the package?

"A. Yes, sir. I could see the contents of it.

"Q. And what did the contents appear to be?

"A. It seemed to me to be marijuana."

Appellant was then placed under arrest and officer Sieck put him in the squad car and got his *Miranda* card and read him "his rights". Sieck testified that after he gave appellant his rights, he asked him if he understood them and appellant replied in the affirmative.

Sergeant Wellford called Captain Donald Riddle to report the discovery and Riddle and two other officers came to the scene. Riddle told one of these officers—Simmons—to get in the car with appellant and give him his rights. Simmons did so and reported to Riddle that appellant refused to sign a waiver. Riddle instructed Simmons and Sieck to get a search warrant from one of the Judges of the Court of General Sessions and to carry appellant to the Detective Division of the Police Department. Riddle called a wrecker and had the Chrysler automobile moved to the Uptown Garage on Royal Street in Mobile. The search warrant was secured and the trunk of the Chrysler was opened in the presence of Riddle and several other officers at the Uptown Garage. Before going to the garage, Riddle went by the County Court House and picked up Dr. Nelson E. Grubbs, Assistant State Toxicologist stationed in Mobile, and he was present when the search warrant was read and the trunk of the Chrysler opened. There were two hundred and fifty (250) packages in the trunk of the car about the size of an average shoe box. Photographs of the contents of the trunk were taken before the contents were removed. All packages were taken from the trunk and put in Riddle's car and carried to Dr. Grubbs' office in the Court House.

The Toxicologist took a sample of the material from each of the two hundred and fifty (250) packages and examined it microscopically. He also used the Deuqunoid Test in his analysis. He explained this test as follows:

"It consists of extracting from the plant material any rosinous properties that the material might have and combining the extract with chemicals, vanillin, alcohol and acid; allowing it to sit for ten minutes and then adding chloroform to it which gives a definite blue color which is positive only for marijuana."

He further testified that the two hundred and fifty (250) packages were marihuana, and that the total weight was 202,068.9 grams or 467.5 pounds.

Numerous exhibits—forty odd—including the marihuana, photographs of same, the affidavit and search warrant, were properly identified and introduced in evidence, but no exhibits were sent to this court for inspection. We cannot pass on something we have not seen. An appellant is charged with the duty of presenting a correct record to an appellate court, and this court can deal on review only with the record as filed by appellant. Colburn v. State, 40 Ala.App. 248, 112 So.2d 800.

Appellant was put to trial on a two-count indictment, (1) unlawful possession of marihuana, and (2) did unlawfully

transport marihuana. Appellant's first claim of error is based on the action of the trial court in instructing the jury that the transportation of marihuana is unlawful. It is his contention that he was convicted of an act that was not a crime at the time of his trial. This appellant was arrested on June 16, 1969, and was indicted on the 30th day of July, 1970. The law in force and effect at the time of his arrest and indictment was Chapter 9, Title 22, Section 256, Code of Alabama 1940. This Section was amended on August 29, 1969 (General Acts of 1969, Act No. 625). The Amendment did not change the penalty provisions of the law but did broaden the offenses denounced.

When the Legislature enacted the Alabama Uniform Controlled Substances Act (Act No. 1407, Regular Session 1971), approved September 16, 1971, for some unknown reason, it omitted the word "transport" from the section prescribing the prohibited acts. See Title 22, Section 258(47)(a). Appellant's trial commenced on October 28, 1971, a little more than a month after the passage and approval of the Uniform Controlled Substances Act and he asserts that the court below committed reversible error in not dismissing count two of the indictment charging "transportation".

Appellant contends, therefore, that the repeal of a criminal statute requires the dismissal of all pending criminal proceedings for violation of the statute. It is claimed that the principle of abatement is so firmly embedded in our jurisprudence as to be a necessary and proper part of every statute working a repealer of criminal legislation. He relies on the following cases: Hamm v. Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300; United States v. Chambers, 291 U.S. 217, 54 S.Ct. 434, 78 L.Ed. 763, and Bell v. Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822.

It is not necessary for us to resort to Federal Law in dealing with this proposition. Over a hundred years ago the Legislature of this State enacted what is now Title 1, Section 11, Code of Alabama 1940, which provides, in pertinent part, as follows:

"No repeal, revision, amendment, or alteration of any law shall in any manner affect any prosecution for an offense committed under the law so repealed, revised, amended, or altered, unless the repealing, revising, amending, or altering law shall otherwise expressly provide; * * *"

■ By this section all prosecutions for violation of the state laws are saved from being affected by a repeal of the statute under which they are committed. Birmingham v. Baranco, 4 Ala.App. 279, 58 So. 944; Balsam v. State, 13 Ala.App. 252, 69 So. 226; Banks v. State, 42 Ala.App. 519, 170 So.2d 417.

Appellant insists that the search of the automobile was illegal and that the statement he made to the officer that he had a trunk load of marihuana did not show consent to search the automobile or amount to a confession in the absence of proof that the statement was freely, intelligently and voluntarily made.

It must be borne in mind that the statement made by appellant to officer Sieck was made before he was arrested, before he was taken into custody, and before he was deprived of his freedom by the police *in any manner whatsoever*. This statement was freely and voluntarily made and prior to any interrogation. Appellant practically forced the officer to take the keys to his Chrysler automobile and gave the officer everything but an engraved invitation to open the trunk to his automobile. Before the officer even spoke to appellant, he gave the officer his car keys and told him what you want is in the trunk of the car. The natural response of the officer to this statement was to ask appellant, "What is in the trunk?". Appellant replied the trunk is loaded with marihuana.

**564**

■ Courts throughout the Country have consistently held that searches without warrants are constitutionally permissible when executed with the owner's consent. Securing a search warrant is wholly unnecessary when consent to search has been freely given. In Payton v. State, 47 Ala.App. 347, 254 So.2d 351, this Court held that consent to search the trunk of the car was plainly given when appellant was asked if it would be alright if they (the officers) searched his trunk and he replied, "The keys are in the switch." The consent to search in this case is much stronger than in *Payton,* supra.

■ On authority of *Payton,* supra, and Truex v. State, 282 Ala. 191, 210 So.2d 424, we hold that appellant consented to the search of his automobile and he cannot be heard to claim his constitutional rights were violated, and the statement he made to officer Sieck was a voluntary admission that his automobile was loaded with marihuana and was properly admitted in evidence. See also, Rodriquez v. State, 168 Tex.Cr.R. 481, 329 S.W.2d 282; Com. v. Guidotti, 14 Bucks 150; Searches and Seizures, 7th Decennial Digest ⟨key⟩7(27)(28).

Appellant was accorded his full constitutional rights during his trial. That is all he has a right to expect. He was represented by outstanding lawyers of his own choosing and they conducted a vigorous defense raising every conceivable issue in protecting his rights. What started out to be a simple case of possession and transporting marihuana ripened into a courtroom battle of major dimensions, all to the credit of our adversary system. This three hundred and eighty-four (384) page record shows their resourcefulness and ingenuity.

In view of what we have said, there was no error in the rulings of the trial court on the many motions filed and argued by counsel, nor in the rulings of the court on the motion to suppress the evidence and to exclude the same.

We have carefully searched the record for errors affecting the substantial right of appellant and have found none. The case is due to be affirmed and it is so ordered.

Affirmed.

ALMON, TYSON and DeCARLO, JJ., concur.

CATES, P. J., recuses himself.