Appellant was convicted of carnal knowledge of a girl over twelve and under sixteen years of age. At arraignment, with counsel present, he pleaded not guilty and not guilty by reason of insanity. The jury found him guilty as charged in the indictment and fixed his punishment at imprisonment in the penitentiary for ten years. After sentence was imposed, he gave notice of appeal. He sought and obtained a free transcript of the evidence and he is represented by trial counsel on this appeal. *Page 847 
After appellant was arrested and given the Miranda rights and warnings, he signed a waiver of rights form. After executing the waiver of rights form he made and signed a confession which on voir dire out of the presence and hearing of the jury was found to be knowingly, voluntarily, and intelligently made. Appellant did not testify but his confession was repudiated by the testimony of a woman with whom he was living and who claimed he was just a cousin.
Appellant was twenty years of age at the time of his trial and the Court advised him that he could make application to be treated as a Youthful Offender. He made application for Youthful Offender benefits and it was referred to a probation officer for investigation. The probation officer's report showed that he had previously been convicted of a felony and his application for Youthful Offender treatment was denied because of his felony conviction.
The State's evidence is undisputed that the victim was thirteen years of age at the time of the offense which occurred on July 8, 1975, at the home of one Joann Smith who lived about three doors from the victim's house. Catherene Larry, the mother of the victim, testified that her daughter went to visit Joann Smith on the afternoon of July 8, 1975. That Joann Smith sent her to the store to buy some cookies after which she returned home. Later in the afternoon the victim, Cora Mae Larry, went back to Joann Smith's home and she returned home bleeding from her "private parts." She told her mother what had happened to her and the mother called the Police Department and the victim was carried to the hospital. Before carrying her daughter to the hospital, she talked to appellant and asked him if he ravished her daughter and appellant said, "How do you know. Who told you?" Appellant came to her house later that afternoon asking for the victim and his aunt offered to pay the doctor's bill.
The victim, Cora Mae Larry, testified that she was thirteen years of age and was born on April 15, 1962. She knew Joann Smith as "Ann" who lived down the street from her. She also knew the appellant, Calvin Hawkins, and had known him about a year. Appellant was at Joann Smith's house on July 8, 1975, after Cora Mae Larry came back from the store where she went to buy Joann some cookies. She sat on the sofa with Joann and talked to her a few minutes and then went to her home. Later that afternoon she returned to Joann's house and Calvin Hawkins was there. Appellant sat down on the sofa beside Cora Mae and started kissing her and she told him she didn't like kissing as she was too young. Appellant kept kissing the victim and told her to, "let's go to the back room," and she refused to go. She further testified that appellant dragged her into the back room by her arm and leg. When he got her in the back room, he pulled out a knife with a yellow handle and put the blade against her throat and told her if she didn't do what he said he would kill her. He told her to pull her underclothes down but she refused to do so. He then pulled them down himself, keeping the knife at her throat, and removed his own clothing. She stated that appellant put his "body in her body" and she began crying because it hurt her inside. When he finished, she went home and told her mother what had happened. Her private parts were bleeding and she was taken to the hospital.
On cross-examination she testified that she had never kissed appellant before though she had seen him at Joann's house before. She further testified that Joann saw her as she was dragged to the back room and that her six-year-old brother looked in the window as the rape progressed and she begged him to get help. She further stated that appellant told her the reason it was hurting her was because it was her first time and said it was good that it was hurting her. *Page 848 
Mary Wisdom, a Toxicologist for the State of Alabama, testified as to her education, experience, and qualifications to perform the duties assigned to her. Her qualifications were admitted by the defense. She recalled seeing Cora Mae Larry on the night of July 8, 1975, in the Emergency Room at Baptist Hospital. She was present when the victim was examined by a doctor and observed the examination of her vaginal area. Mrs. Wisdom observed a great quantity of blood around the vaginal opening, inside the vagina, and around the outside of the vaginal opening. She also observed several tears or abrasions in the tissue around the vaginal area as they were pointed out to her by the doctor. This witness had observed examinations in sex-related cases many times before. The doctor who performed the examination took two slide specimens from the victim in Mrs. Wisdom's presence and Mrs. Wisdom immediately took the slides to the laboratory at the hospital and examined them under the microscope and found numerous red blood cells intact. She also found spermatozoal, or sperm cells, and a moderate number of vaginal cells. Mrs. Wisdom was present when the doctor took and delivered to her a saline wash of the vagina which she carried to the laboratory and examined under a microscope. She found numerous red blood cells and there were intact or whole spermatozoal, many of which were motile. They were still alive.
Mrs. Wisdom further testified that she observed a pair of slacks and a pair of panties which were given to her by Detective Faye Henderson. The slacks had a large stained area in the crotch which contained large quantities of human blood and seminal fluid. There was a similar stain on the panties. Upon examination of the panties she found blood and human seminal fluid and some whole sperm in this stain. The clothing was sealed up with Mrs. Wisdom's initials under the seal and kept in an evidence locker until they were delivered to Mr. William Landrum at the State Toxicology Laboratory at Auburn.
Detective Faye Henderson testified that she was employed by the Montgomery Police Department in the Youth Aid Division and had been so employed for five years. She talked with Cora Mae Larry and her mother at their home on Sierra Street on July 8, 1975, and observed Cora Mae to be emotionally upset. She stated that the victim was having difficulty in walking and she accompanied her and her mother to the Baptist Hospital Emergency Room. She was given a stained pair of panties and shorts at the Sierra residence which she turned over to Mrs. Mary Wisdom at the hospital.
William H. Landrum testified that he was employed by the State Department of Toxicology and Criminal Investigation, and had been so employed for almost four years. He was qualified as a Forensic Serologist, trained in the examination of human tissue and secretion from the human body to determine the sources from which they come. He identified the clothing delivered to him by Mrs. Wisdom and identified the blood stains inside the crotch of those items and they were introduced in evidence. Mr. Landrum also testified that he received a fitted bed sheet and an orange bedspread.
Mrs. Wisdom was recalled by the State and stated that she received from Detective J.E. Lloyd a large brown paper bag which she did not open, but which she delivered to Mr. Landrum.
Mr. Landrum was recalled and stated that he found human blood on the sheet and the bedspread.
John E. Lloyd testified that he was employed by the Youth Aid Division of the Montgomery Police Department. He was working with Detective Faye Henderson. He visited a house on Early Street where the offense was believed to have been committed. The defendant was not at this *Page 849 
address when he arrived. He told Joann Smith that he was a police officer and his purpose for coming there. He told Mrs. Smith that certain items might be needed for evidence and she consented for the officer to enter her house. She told the officer that Cora Mae Larry had been in her home that afternoon and showed him the bedroom in the back part of the house where appellant and Cora Mae had been. Mrs. Smith gave Officer Lloyd permission to take the bedclothes with him. The officer put the sheet and bedspread in a bag and put them in an evidence locker and two days later he delivered them to the office of the Toxicologist.
Officer Lloyd further testified that later that night he arrested appellant pursuant to an arrest warrant and carried him to the station house. Before asking appellant any questions he gave him the Miranda rights and warnings and he signed a waiver of rights form. After the waiver of rights form was executed, he gave the officer a statement which was later reduced to writing and signed by appellant, and witnessed by Lloyd and Detective Henderson.
After the proper predicate was laid, the officer was asked to read the statement to the jury.
From the record:
 "THE WITNESS: This is a statement from Calvin Hawkins, colored, male, age twenty, 1023 Early Street, concerning his part in the alleged crime of Cora Mae Larry, colored, female, age thirteen, 1415 Sierra Street. Calvin has been read his Rights and knows and understands what he is doing and gives this statement willingly.
 "The statement is: `Cora Mae came to the house and I asked her to come and sit with me on the sofa. After she sat on the sofa with me we started talking and after a few kisses I asked her to come into the bedroom with me. After we got in there we continued kissing and then asked her to remove her pants. After we got started for about ten minutes her brother came in to the door and called Cora Mae. Since this was her first time she was making a lot of noises. Then her brother ran to their house and later on her parents came down there. They told me that Cora Mae was bleeding and I told them that I was the one.
 "QUESTION. Was this the first time that you have ever had sex relations with Cora Mae?
"ANSWER. Yes.
"Did you force her to have sex relations with you?
"No.
 "QUESTION. Did you, in fact, have sex relations with Cora Mae Larry?
"ANSWER. I put it in just a little bit.
 "QUESTION. Is there anything else that you would like to add to this statement?
"ANSWER. No.
 "I have read the foregoing statement and find it to be true and correct. Signed by Calvin Hawkins."
The above statement was admitted into evidence without objections.
Catherene Larry was recalled and testified that Cora Mae was born on April 15, 1962, in Kelly Alley and was delivered by a midwife. She told the midwife what name she wanted her baby to have and the midwife went to the Bureau of Vital Statistics with the information. At this point the trial court had the victim brought into the courtroom and had Mrs. Larry identify her daughter, the one she gave birth to in Kelly Alley in 1962, and she identified her as "Cora Mae." The Court asked her full name and the mother said, "Louise Cora Mae Larry."
Joann Smith was called as the sole defense witness. She testified that she lived at 1023 Early Street and that she knew the *Page 850 
defendant and the victim. She stated the defendant was a cousin and just happened to live with her. She stated that appellant was there every day and Cora Mae was there practically every day. That she observed them "smooching, kissing and hugging, feeling on each other quite a lot." She said that appellant got tired of kissing Cora Mae and got up and went to his room. She did not see appellant drag Cora Mae by the arm and leg to his room and she did not hear any noises coming from the room at any later time. That she got up and started fixing supper and her baby was crying and the dogs were barking, the kids were whooping and hollering, water was running in the sink and she was trying to cook, and if there were any noises in appellant's bedroom, she didn't hear them. She denied that she sent Cora Mae to the store to buy cookies or anything else. On direct examination she did admit giving the police officers permission to come into her home and did admit she consented to the officers taking the sheet and bedspread.
With reference to the warrantless search of her home she testified that she gave the officers permission to enter her home and gave them permission to take the spread and sheet off the bed. Her consent is fully supported by the record as follows:
"Q. What did they do when they went to your house?
 "A. Well, he asked me about what happened. He told me a man down the street had signed a warrant to arrest him and he was my husband — you know, he asked me how long me and my husband had been together, and I told him I had never been married in my life.
"Q. Did you ever go in the back room?
"A. Yes, we went in the room.
"Q. Did you invite them back there?
 "A. No, but he asked me where was the back room so I showed him.
"Q. Did he take any articles from there?
"A. He took a spread and a sheet off the bed.
"Q. Did you give him permission to take those?
"A. Yes.
 "Q. You told him it was all right for him to have them?
"A. I told him it was all right.
"Q. What did he say to you before he took them?
 "A. Well, that he just needed evidence to see if he raped her or anything; they find some blood stains on the sheet and spread.
"Q. And you gave them to him?
"A. Yes."
It took the jury only 18 minutes to find appellant guilty as charged in the indictment and fix his punishment at ten years imprisonment in the penitentiary.
Appellant urges this Court to reverse this case because the officers did not have a search warrant when they went to Mrs. Smith's house and got the sheet and the bedspread. To comply with this request we would have to completely ignore the facts in this case and the controlling law.
Mrs. Smith testified that she not only occupied the residence searched, but also that it was her house and the appellant merely happened to be living with her. She gave consent to search her house and consented for the officers to take the sheet and bedspread. Myers v. State, 55 Ala. App. 404,316 So.2d 235; United States v. Matlock, 415 U.S. 164, 94 S.Ct. 988,39 L.Ed.2d 242; Daniels v. State, 290 Ala. 316, 276 So.2d 441.
Courts throughout the country have consistently held that searches without warrants are constitutionally permissible when executed with the owner's consent. Securing a search warrant is wholly unnecessary when consent to search has been freely *Page 851 
given. Payton v. State, 47 Ala. App. 347, 254 So.2d 351;Hernandez v. State, 50 Ala. App. 558, 280 So.2d 831; Schnecklothv. Bustamonte, 412 U.S. 218, 93 S.Ct 2041, 36 L.Ed.2d 854.
Appellant claims there was a fatal variance in the name of the victim as laid in the indictment and the proof offered at trial. Appellant introduced the birth certificate showing the girl's name to be "Louise Pamela Larry" and the proof showed her name to be "Louise Cora Mae Larry."
An indictment is sufficient, and there is no variance, if it describes the person injured by a name by which she was known and called, and by which the defendant knew her. Langston v.State, 8 Ala. App. 129, 63 So. 38.
The evidence is undisputed that the victim was known in the community by the name of "Cora Mae Larry." It is also undisputed that appellant knew her by that name. The evidence left no doubt as to the identity of the victim.
Appellant filed a motion for a new trial which motion was overruled and denied.
We have repeatedly held that a decision on a motion for a new trial rests largely within the sound discretion of the trial court and, in reviewing that decision, this Court will indulge every presumption in favor of the correctness thereof. Moore v.State, 52 Ala. App. 179, 290 So.2d 246; Johnson v. State,51 Ala. App. 172, 283 So.2d 624; Espey v. State, 270 Ala. 669,120 So.2d 904.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
TYSON, DeCARLO and BOOKOUT, JJ., concur.